use. Its utility is marked. In some cases, this adoption and utility might be persuasive that invention exists; but we think this case is too clear for the application of that criterion. Very likely the true explanation why the device was not thought of and given this application earlier is because prior to 1910 the use of closed automobile bodies had not been general enough to challenge attention to this trouble, and because the art was developing so rapidly that attention was centered on other more serious matters; at any rate, these considerations partly explain the absence of direct and clear anticipation. We pass by without consideration some approximations which are claimed to anticipate.

[2] It is said that when the outer window is not projected as a storm shield, but is allowed to hang vertically just in front of the inner window, there is produced a quasi dead air space between the two which causes a two-step instead of a one-step difference in temperature between the warmer air inside the car and the cold outside, and which, therefore, prevents or minimizes condensation of moisture on the inner surface—which condensation or "frosting" is troublesome under some conditions. Whether this beneficial result actually follows in substance rather than in theory is not very sure, but, if we assume that it does, it is only an additional advantage coming from a new use which is, inherently, a mere double use; and if, as we hold, there is no invention in adding this angularly projecting and adjustable glass shield in front of a window and in carrying it in an extended position of adjustment, there cannot be invention in carrying it in any other position of adjustment. If the outer window, dropped into this vertical position, has any aspect not already considered, it is that of the familiar double window in residences whereby heat radiation from the room is lessened. For these reasons, we cannot find in this function any more validity for the claims than we find in the angular position of the shield.

We conclude that both decrees must be reversed and the cases remanded, with instructions to dismiss the bill.

---

### BROWN PERFECTION TUBE CO. v. BROWN et al.

(Circuit Court of Appeals, Second Circuit. May 9, 1916.)

No. 263.

PATENTS ⬦93—OWNERSHIP—AGREEMENT TO ASSIGN.

Defendant assigned patents to complainant, and entered its employment on a salary for the purpose of perfecting and improving the patented article; any invention or patent therefor made during the employment to be the property of complainant. His salary was not paid, but, having made patentable improvements on the device, complainant paid the arrears, and a new contract was made, by which the employment was continued on the same terms, except that defendant .was to receive a royalty, instead of a salary, and was given the right to terminate the contract for any default of complainant, which he subsequently did by giving notice of rescission. *Held*, that by accepting the salary under the first contract he waived the prior default, and any invention made dur-

ing its term belonged to complainant; that the notice of rescission was only effective from the time of complainant's default under the second contract; and that any invention made prior thereto, or patent therefor, was the property of complainant, but that any made after that time belonged to defendant.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 125; Dec. Dig. ⬤═══93.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Brown Perfection Tube Company against John H. Brown, Horace R. Wemple, and A. Grover Fitzgerald. Decree for complainant, and defendants appeal. Affirmed.

The following is the opinion of Sheppard, District Judge, in the lower court:

It appears from the material portions of the record that the defendant Brown and his partner in the venture, Herman D. Selleck, entered into a contract with the Brown Perfection Tube Company, under which they transferred all right, title, and interest in and to certain patents for pneumatic rubber tubes then in existence, or for which applications had been filed or were to be filed in the future for improvements or betterments, receiving as a consideration therefor the greater portion of the stock issued by the Brown Perfection Tube Company. Because of apparent imperfections in the tube as then manufactured, it was further agreed that Brown was to give the company the benefit of his services in perfecting this tube, and all patents applied for or to be obtained in the future covering improvements made during the time that he was connected with the company under the agreement, in consideration for which Brown was to receive a salary of about $125 per month. The Brown Tube Company was unable to pay this salary to Brown after the first month. During the time that this contract was in force, and after the company had failed to carry out its part of the contract, Brown in the latter part of the year 1911 perfected a tube, the patent and applications for patent on which is the important subject-matter of this suit.

On May 21, 1912, Brown entered into a further agreement with the company, but as a condition precedent to his entering into it required full payment of the back salary claimed to be due him. The company acceded to this demand and paid him the full amount claimed to be due under the old contract. In accepting this payment Brown waived the prior defaults of the company and left the first contract proprio vigore, and the company was thereafter entitled to all of Brown's improvements and betterments on the inventions assigned to the company. Whatever the terms and conditions of the new contract of 1912, the improvements on the tube and its process of manufacture which Brown had worked out during the life of the old contract belonged to the company, regardless of whether or not applications had been actually filed for patents.

Now as to the contract of May 21, 1912, it recites the transfer by Brown to the company of the older patents and a covenant for the transfer of all applications and patents made or obtained in the future. It also provided that Brown was to remain with the company and give it the benefit of all improvements and betterments, both in the tube and its process of manufacture, and for this service he was to receive, "in lieu of the salary heretofore paid," compensation by way of royalties, with the further provision that Brown could, upon default by the company, cancel, annul, and terminate the contract. These provisions, when taken together with the obvious intention of the parties under the old contract, would hardly leave any room for doubt as to the company's rights, had it complied with its agreement and paid the royalties. Upon this breach of the second contract, Brown served notice on the company of his intention to rescind the contract; and the company, failing to redeem itself under the provision made, will not, of course, be entitled to any benefits from whatever improvements or better-

ments Brown may have made in the tube subsequent to the breach of the second contract.

The provision for royalties "in lieu of the salary" theretofore paid for services was simply a change in the manner of payment for the convenience of the company, and this is the only part of the contract subject to rescission. The company's rights to the patents, improvements thereon, and applications, present and future, had become fixed, and his rescission was unavailing, except, of course, to give him (Brown) the absolute right to whatever improvements or betterments he had made subsequent to the breach of the second contract.

Counsel may prepare the proper orders.

Duell, Warfield & Duell, of New York City (R. W. France, of New York City, of counsel), for appellants.

Prindle, Wright & Small, of New York City, for appellee.

Before COXE, Circuit Judge, and VEEDER and MAYER, District Judges.

PER CURIAM. Affirmed, with costs, on the opinion of Judge Sheppard.

---

STAHLBRODT CO. v. FORD MOTOR CO.

(District Court, W. D. New York. March 14, 1916.)

No. A–96.

1. PATENTS ⬦⟞328—VALIDITY AND INFRINGEMENT—WIND SHIELD FOR MOTOR VEHICLES.

The Samuel reissue patent, No. 13,574 (original No. 879,195), for a wind shield for motor vehicles, is within the invention of the original patent, the claims being narrower, was not anticipated, and discloses invention; also *held* infringed.

2. PATENTS ⬦⟞141—REISSUE—DEPARTURE FROM ORIGINAL PATENT.

A reissue patent is not invalid because the claims include features not specifically claimed in the original patent, where they were fully described in the specification and their relation to the other parts shown.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 206–213; Dec. Dig. ⬦⟞141.]

In Equity. Suit by the Stahlbrodt Company against the Ford Motor Company for infringement of reissue letters patent No. 13,574 (original No. 879,195), for a weather screen for motor and similar vehicles, granted to Henri Saul Samuel June 10, 1913. On final hearing. Decree for complainant.

Church & Rich, of Rochester, N. Y. (Melville Church, of Washington, D. C., of counsel), for complainant.

Whittemore, Hulbert & Whittemore, of Detroit, Mich. (James Whittemore, of Detroit, Mich., of counsel), for defendant.

HAZEL, District Judge. [1] This action is for alleged infringement of reissue patent No. 13,574, dated June 10, 1913, and issued to complainant company on application filed in September, 1912, for improvements in wind shields or weather screens for motor cars and